**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SANTA MONICA FOOD NOT BOMBS, an
unincorporated association;
INTERNATIONAL ANSWER/LOS ANGELES,
an unincorporated association;
DEBORAH BAXTER; MOIRA LA
MOUNTAIN; CHRISTINE SCHANES,
       *Plaintiffs-Appellants,*

       v.

CITY OF SANTA MONICA, a municipal
corporation; SUSAN E. MCCARTHY;
JAMES T. BUTTS,
       *Defendants-Appellees.*

No. 03-56621

D.C. No.
CV-03-00032-
MLR

---

SANTA MONICA FOOD NOT BOMBS, an
unincorporated association;
INTERNATIONAL ANSWER/LOS ANGELES,
an unincorporated association;
DEBORAH BAXTER; MOIRA LA
MOUNTAIN; CHRISTINE SCHANES,
       *Plaintiffs-Appellants,*

       v.

CITY OF SANTA MONICA, a municipal
corporation; SUSAN E. MCCARTHY;
JAMES T. BUTTS,
       *Defendants-Appellees.*

No. 03-56623

D.C. No.
CV-03-00032-
MLR

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
February 14, 2005—Pasadena, California

Filed June 16, 2006

Before: Andrew J. Kleinfeld, Kim McLane Wardlaw, and
Marsha S. Berzon, Circuit Judges.

Opinion and Partial Dissent by Judge Berzon;
Partial Majority Opinion, Partial Concurrence, and
Partial Dissent by Judge Kleinfeld;
Concurrence by Judge Wardlaw

**COUNSEL**

Carol A. Sobel, Law Office of Carol A. Sobel, Santa Monica, California, for the appellants.

Barry A. Rosenbaum, Senior Land Use Attorney, Santa Monica, California, for the appellees.

**OPINION**

BERZON, Circuit Judge, with whom Judge Kleinfeld concurs except as to Sections II.B.2.b.(1)(ii) and II.C, and Judge Wardlaw concurs except as to Section II.C:

We consider the facial constitutionality of ordinances enacted by the City of Santa Monica to regulate activity in its outdoor public spaces. During the pendency of this litigation, both these ordinances and Santa Monica's administrative interpretation of them have changed substantially. Appellants' persistent urging and Santa Monica's willingness to change its regulations have together produced a transformation in the applicable permitting scheme that — to the credit of all par-

ties involved — provides significantly more opportunity for those who wish to make their views heard in public spaces to do so without first obtaining permits.

We review only the present version of the ordinance and implementing regulations and, of course, only those portions that appellants specifically challenge.[1] Doing so, we hold that Santa Monica's Community Events Ordinance is, save a single provision, a content-neutral time, place, and manner restriction that does not violate the First Amendment. One provision of Santa Monica's administrative interpretation of the ordinance, however, is not constitutionally sound and cannot be enforced. Additionally, the facial challenges to other ordinances either are moot or fail on the merits.

## I.   FACTUAL AND LEGAL BACKGROUND

### A.   Santa Monica and the Ordinances at Issue[2]

---

[1] As always, we are not to be understood as having reviewed or approved aspects of the ordinances or implementing regulations not here challenged. To clarify our holdings in this sensitive area, we have endeavored throughout to be quite specific about the limited nature of the challenges to which we respond.

[2] Santa Monica has requested that we take judicial notice of six documents: Staff Report, City Council of the City of Santa Monica (Feb. 10, 2004) at 6-20; Staff Report, City Council of the City of Santa Monica (Feb. 10, 2004) at 21-31; City of Santa Monica Ordinance No. 2116; City of Santa Monica Ordinance No. 2117; Event Permit Application; City of Santa Monica Defense, Indemnity, and Hold Harmless Agreement. Santa Monica submits that each document is a certified public record. The first four documents are on file with the City Clerk of the City of Santa Monica. The remainder can be accessed at Santa Monica's official website found at www.santa-monica.org/ccs/events and are on file with the Open Space Management Division of the Community and Cultural Services Department of the City of Santa Monica. Judicial notice may be taken of a fact "not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201. We decline to take judicial notice of the two Staff Reports, as they are not relevant to the resolution

The City of Santa Monica ("Santa Monica" or the "City") is a vibrant beach community in southern California occupying less than eight square miles with a weekday population of 300,000 that swells to 500,000 on weekends. About eight percent of the land in Santa Monica is dedicated to public open space, of which 245 acres are dedicated to public parks. The limited public park space is occupied, in part, by tennis, basketball, and shuffleboard courts, a lawn bowling green, baseball and soccer fields, a gymnasium, a child care center, and senior and youth centers. The remaining public park space is used by large numbers of people for a variety of activities, both organized and spontaneous. For example, schools, companies, churches, and the City itself sponsor picnics, festivals, rallies, and demonstrations in the parks.

Santa Monica's downtown area accommodates fairly dense usage. It includes the popular Third Street Promenade, an outdoor pedestrian mall lined with shops, movie theaters, and restaurants and frequented by street performers. In the recent past, Santa Monica has seen demonstrations in public open spaces and in front of hotels and retail stores on issues concerning workers' rights, environmental protection, and the abolition of sweatshops.

Before the district court, appellants challenged the constitutionality of Santa Monica's (1) street banner ordinance, Santa Monica, Cal., Mun. Code ("SMMC") §§ 4.08.490-.500; (2) community events ordinance, SMMC §§ 4.68.010-.220; and (3) food distribution ordinances, SMMC § 5.06.010 (concern-

---

of this appeal. *See Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 392 n.7 (9th Cir. 2000); *Ruiz v. City of Santa Maria*, 160 F.3d 543, 548 n.13 (9th Cir. 1998). The rest of the documents are proper subjects for judicial notice. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (noting that judicial notice may be taken of public records); *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) ("[C]ity ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice."). Santa Monica's request is granted as to them.

ing food distribution in public parks) and SMMC § 5.06.020 (concerning food distribution on public streets and sidewalks). Those aspects of these ordinances central to the resolution of the issues presented are set forth in detail in this section. Other provisions, not described immediately below, are set forth in later portions of this opinion as they become relevant.

### 1.  *The Community Events Ordinance*

To manage competing uses of Santa Monica's public spaces, streets, and sidewalks while "protect[ing] the rights of people to engage in expressive activities in the City's public places," SMMC § 4.68.010, the Santa Monica City Council adopted Ordinance No. 2008 (CCS) § 1, adding Chapter 4.68 to the Santa Monica Municipal Code, on May 8, 2001. Chapter 4.68, known as the Community Events Ordinance (the "Events Ordinance"), establishes a permitting process for community events held in public spaces including parks, streets, and sidewalks. The Events Ordinance was amended on November 13, 2001, by Ordinance No. 2024 (CCS), and again on April 22, 2003, by Ordinance No. 2073 (CCS). The most recent amendment occurred after appellants had filed their complaint.

The Events Ordinance specifically provides that "[t]he City Manager, or his/her designee, shall adopt administrative regulations that are consistent with and that further the terms and requirements set forth within this Chapter." SMMC § 4.68.200. Pursuant to this provision, the City Manager issued Administrative Instruction No. II-4-4 (the "Instruction"),[3] on June 7, 2001, to aid Santa Monica's staff in implementing the Events Ordinance. The Instruction has been amended three times, on July 7, 2003, on July 15, 2003, and, most recently, on February 8, 2005.

---

[3]Unless otherwise specified, all references to the Instruction are to the February 8, 2005 version in effect at the time this case was argued before this Court. *See* Instruction, http://santa-monica.org/ccs/events/pdf/ii-~4-4.pdf (last visited May 8, 2006).

The Events Ordinance requires that permits be obtained for three categories of community events:

> (a)   A parade, procession, march or assembly consisting of persons, animals, vehicles, or any other combination thereof, which is to assemble or travel in unison on any public street, highway, alley, sidewalk or other City-designated public way and which either (1) may impede, obstruct, impair or interfere with free use of such public street, highway, alley, sidewalk, or other public way . . . or (2) does not comply with normal or usual traffic regulations or controls;

> (b)   Any activity or event involving one hundred fifty or more persons on City owned, controlled, or maintained property not subject to the requirements of subsection (a) of this Section;

> (c)   Any activity or event on public property which requires the placement of a tent, canopy, or other temporary structure if that placement requires a permit from the City Fire Department or Building and Safety Division.

SMMC § 4.68.040. As to subsection (a), the Instruction states that marches, processions, walks, runs, and assemblies on public sidewalks or park paths require a permit only if the event "is likely to . . . interfere with the free use of any public way by others . . . or not comply with traffic regulations." Instruction at 23 (Section V(4)). Further, the Instruction sets out a "safe harbor" provision which establishes that a march, procession, walk, run, or assembly "will not interfere with the free use by others," and does not require a permit, if the group consists of 500 or fewer people and the participants "[a]ssemble, march, walk, or run in groups of less than 50, 2 abreast (to create spacing between groups), and give way to others they encounter on the public way." *Id.* To avail itself

of this safe harbor, the group must obey all traffic and park regulations and must not obstruct traffic flow. *Id.* As to subsection (b), the Instruction provides that "[f]or purposes of this subsection, any activity or event which the applicant intends to advertise in advance via radio, television and/or widely-distributed print media shall be deemed to be an activity or event of 150 or more persons" *Id.* at 5 (Section III(1)(b)).

The Instruction separates events into three categories, which do not track precisely the categories in the Events Ordinance: Category 1, which encompasses non-expressive events, and Categories 2 and 3, which include all expressive events. *Id.* at 5-6 (Section III(2)(a)-(c)).[4] Category 2 events are "[e]vents not included within Category 1 . . . but which require a permit from Building and Safety and/or the Fire Department." *Id.* at 6 (Section III(2)(b)).[5] Category 3 events are "[e]vents not included within Categories 1 and 2." *Id.* (Section III(2)(c)). Category 2 events require, at a minimum, three business days advance application to obtain a permit; Category 3 events, those most central to this case, require at least two days advance application. *Id.* at 11-12 (Section

---

[4]As provided by the Instruction, Category 1 events are those involving:

> recreation (e.g., games, arts [and] crafts activities, reunions, birthday parties, participatory dances)[;] competition/contests (e.g., surfing contests, sand castle building)[;] spectator sports (e.g., beach volleyball, hockey, basketball)[;] athletic events (e.g., races, runs)[;] circuses, fairs and carnivals (e.g., booths, games, rides and similar amusements)[;] food-related events (e.g., barbeques, cook-offs, picnics, food distribution, food festivals)[;] sales/trade shows/business promotions (e.g., crafts shows, antique shows, merchandise sales or exhibits, product launches)[;] beach/park clean-ups[; and] training activities (e.g., corporate sessions, team-building activities).

Instruction at 5-6 (Section III(2)(a)).

[5]Such permits may be required, for example, for an event involving temporary structures, open flames or candles, cooking, liquid petroleum gas, or pyrotechnics. Instruction at 28 (Section VII(4)).

IV(1)(b)-(c)). Under the Events Ordinance, a permit is not required for "[s]pontaneous events which are occasioned by news or affairs coming into public knowledge less than forty-eight hours prior to such event[s]," if such events are conducted on the lawn of City Hall. SMMC § 4.68.040(g).

To receive a permit, one must submit an application that describes the event, the area, and the manner in which public property will be used and that also provides contact information for the event's organizers. *Id.* § 4.68.050. The Events Ordinance directs that "the Community Events Committee *shall* issue" a permit if certain enumerated criteria are met. *Id.* § 4.68.060 (emphasis added). The ordinance also specifies the bases upon which a permit shall be denied or revoked. *Id.* § 4.68.070. As required by the ordinance, the Instruction also spells out the timing of the review process, establishing response times that depend upon when an application is submitted. *Id.* § 4.68.050(c); Instruction at 47-52 (Section X). For example, if an application for a Category 3 event is submitted between two and ten days prior to the proposed event, a decision on review must be given within two days of the submission. Instruction at 11-12 (Section IV(1)(c)), 51 (Section X). Any permit applicant aggrieved by an adverse decision may appeal to the Chairperson of the Community Events Committee within five business days of the decision; the Chairperson is directed to decide that appeal within one working day. SMMC § 4.68.090.

The Events Ordinance imposes certain additional obligations on permittees. Under it, every permittee must execute an indemnification agreement with Santa Monica agreeing to "defend, indemnify, and hold harmless the City against losses and liabilities incurred from the conduct of the permittee or its officers, employees, and agents." *Id.* § 4.68.110. Unless otherwise exempt — either because prohibited by law or pursuant to the regulations implementing Chapter 4.68 — each permittee must also obtain insurance "that the Risk Manager determines to be necessary and adequate under the circumstances."

*Id.* § 4.68.120(a). The Instruction provides that organizers of expressive events who comply with the indemnification provision "will not be required to meet the insurance requirements . . . unless there is a specific, demonstrable history of personal injury or property damage claims being awarded against the applicant attributable to the applicant's conduct of previous events in the City that are similar in nature to the proposed event." Instruction at 35 (Section VII(14)(g)). Further, "[i]n addition to the payment of the non-refundable permit application fee and as detailed in the administrative guidelines . . . , a permittee shall pay the City for City departmental service charges incurred in connection with or due to the permittee's activities under the permit." SMMC § 4.68.140. The Instruction specifies how these departmental service charges are calculated. Instruction at 36-39 (Section VIII(1)). There is an indigency exception, with fairly complex requirements, to the application fee and service fee requirements, but not to the indemnification provision. SMMC §§ 4.68.080(b)-(c), 4.68.140(c)-(d), & 4.68.120.

In the two years between the adoption of the present system and the summary judgment hearing, almost 190 permit applications were processed. According to the City, of the 190, only two such applications were denied.[6]

### 2.  *The Street Banner Ordinance*

On May 8, 2001, as part of Ordinance No. 2008 (CCS), which established the Events Ordinance, the Santa Monica City Council also amended SMMC § 4.08.490 (prohibiting street banners) and SMMC § 4.08.500 (providing exceptions

---

[6]Santa Monica offers the following explanations regarding the denied permits: The first was denied because the applicant wanted to use an entire major arterial street, Ocean Avenue, during peak traffic hours; the City suggested that the demonstration be moved to off-peak hours or onto the sidewalk, but the applicant refused these alternatives. The other denial occurred when an applicant applied only one day before the event.

to the street banner prohibition). On February 24, 2004, however, the Santa Monica City Council amended the ordinance to allow street banners only for city-produced or city co-produced events. The exceptions to the general ban on street banners provided for in the earlier version of SMMC § 4.08.500 were stricken.

3. *The Food Distribution Ordinance*

On October 22, 2002, the Santa Monica City Council adopted Ordinance No. 2055 (CCS), which added two provisions to the municipal code regarding the distribution of food.

The first food distribution ordinance, SMMC § 5.06.010 (Oct. 22, 2002), concerned public parks and stated that:

> Any person who serves or distributes food to the public in City parks or on the City Hall lawn must:
>
> (a) comply with applicable state health and safety standards regulating food service and distribution, including, but not limited to, the requirements of obtaining and displaying a valid permit from the Los Angeles County Department of Health which includes City approval as to location; and
>
> (b) comply with all applicable requirements of the City of Santa Monica's Community Events Law.

The second food distribution ordinance, SMMC § 5.06.020 (Oct. 22, 2002), concerned distribution of food on public streets and sidewalks. That provision declared:

> No person shall distribute or serve food to the public on a public street or sidewalk without City authorization. Any person violating this Section shall be guilty of a misdemeanor which shall be punishable by a fine not exceeding One Thousand Dollars

per violation, or by imprisonment in the County Jail for a period not exceeding six months, or by both such fine and imprisonment.

On February 24, 2004, the Santa Monica City Council amended both food distribution provisions. With respect to the October 22, 2002 version of SMMC § 5.06.010 (public parks), the City added language clarifying that "City approval" meant approval "pursuant to State guidelines administered by Los Angeles County and guidelines adopted by the City." SMMC § 5.06.010(a). Additionally, the amended ordinance clarifies that compliance with Santa Monica's Park Maintenance Code is necessary.

With respect to the October 22, 2002 version of SMMC § 5.06.020 (public sidewalks), the Council clarified that City authorization could come "in the form of a vending permit, use permit, outdoor dining license or community event permit." SMMC § 5.06.020. Of particular import to this case, the ordinance now states that "no permit or license shall be required for a *noncommercial food distribution that does not interfere with the free use of the sidewalk or street* by pedestrian or vehicular traffic." *Id.* (emphasis added).

## B.   Appellants[7]

The appellants are several plaintiffs who, together, challenged these ordinances and regulations. As their standing is at issue, we briefly describe each.

Plaintiff Santa Monica Food Not Bombs is an unincorporated association that seeks to highlight a "connection between the lack of food for the poor and war-preparation activities of the United States government." The organization "regularly provides meals to homeless residents of the City of

---

[7]To simplify matters, when we refer to appellants collectively we allude to them as "Food Not Bombs."

Santa Monica." One of its organizers, Peggy Lee Kennedy, declared that in so doing they "have never been told [that they] have impeded anyone's passage on the sidewalks or other public ways." On January 3, 2003, the organization helped set up a march from Palisades Park to the Third Street Promenade. The marchers distributed lollipops emblazoned with messages such as "War Sucks." The march was meant, in part, to protest Santa Monica's food distribution ordinance as applied to sidewalks.

Also, the organization has participated in several protests on the lawn of the Santa Monica City Hall and often plans or participates in spontaneous demonstrations. For example, on February 15, 2003, the group participated in an event called "Peace on the Beach" in Santa Monica. In April 2003, a Santa Monica Park Ranger told the group that Santa Monica intended to start enforcement of the challenged ordinances and that in the future the group would need to comply with the permitting ordinance.

Plaintiff INTERNATIONAL ANSWER/LOS ANGELES ("ANSWER") is an organization that secured permits and scheduled a number of demonstrations in the City of Los Angeles in 2003. ANSWER has also participated in several spontaneous demonstrations without a permit, such as a march in Hollywood following the outbreak of the war in Iraq. ANSWER would like to hold a march in Santa Monica but has chosen other locations instead because of the permit requirements, which it regards as overly cumbersome. Also, ANSWER claims that Santa Monica's "spontaneous event" policy is inconsistent with the way the group organizes events; it might prefer, for example, to hold a spontaneous demonstration near a hotel where a public figure is speaking, rather than on the City Hall lawn.

Plaintiff Deborah Baxter is a Religious Science Practitioner and one of the coordinators of Hand-to-Hand Hunger Project (the "Project"). The Project serves food to homeless and some

non-homeless people in front of City Hall on Saturdays and city holidays. According to Baxter, the Project has never obstructed entry to City Hall. Baxter has participated in several protests in front of City Hall challenging the food distribution ordinance as applied to public sidewalks.

Plaintiff Moira LaMountain is a coordinating member of Helping Other People Eat ("HOPE"). HOPE serves meals twice a week, fifty weeks a year in Palisades Park. LaMountain does not believe it would be economically feasible for HOPE to comply with Santa Monica's ordinances because to do so the organization would have "to provide toilets and hot and cold running water among other things."[8] LaMountain does not believe the state regulations apply to HOPE but fears that she will be jailed under the ordinances. HOPE also participated in the January 3, 2003 march from Palisades Park to the Third Street Promenade.

Plaintiff Christine Schanes is a founder and leader of Children Helping Poor and Homeless People ("CHPHP"). CHPHP regularly serves food to homeless people in Santa Monica, both at Memorial Park and on public sidewalks. Schanes reports that on June 23, 2003, a member of CHPHP was told by a Santa Monica Park Ranger that the group could not serve food at Memorial Park without a permit from the County Health Department. Schanes fears being prosecuted for a misdemeanor because she regularly gives out food to homeless people on sidewalks.

## C.   Lower Court Proceedings

On January 3, 2003 — the same day as the abovementioned march from Palisades Park to the Third Street Promenade — Food Not Bombs filed a complaint seeking, as here pertinent:

---

[8]LaMountain offers no explanation as to why she thinks that the applicable ordinances so required, and it is not apparent from the record that they did.

(1) declaratory and injunctive relief under the First and Fourteenth Amendment and 42 U.S.C. § 1983; (2) declaratory and injunctive relief under analogous provisions of the California Constitution;[9] and (3) declaratory and injunctive relief under state statutory law, on the ground that certain aspects of the challenged ordinances are preempted by state law.[10] On August 11, 2003, the district court granted Santa Monica's motion for summary judgment,[11] adopting, for the most part, the defendants' proposed Statement of Uncontroverted Facts and Conclusions of Law and declining to hold any aspect of the challenged ordinances facially unconstitutional. Food Not Bombs appealed to this Court.

## II.   ANALYSIS

### A.   Street Banner and Food Distribution Ordinances

As a preliminary matter, we must clarify which, if any, of the original challenges to the street banner and food distribution ordinances are still live. "We must review the judgment of the District Court in light of [the] law as it now stands, not as it stood when the judgment below was entered." *Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412, 414 (1972) (per curiam); *Lathan v. Volpe*, 455 F.2d 1111, 1123 (9th Cir. 1971) (citing *Diffenderfer*); *see also Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) ("Where a law is amended so as to remove its challenged features, the claim for injunctive relief becomes moot as to those features.").

---

[9]The analogous free speech claims under the California Constitution either were abandoned by Food Not Bombs in the Memorandum of Points and Authorities to the district court or have not been asserted here.

[10]The complaint contained a prayer for damages, but Food Not Bombs now seeks only prospective relief.

[11]The motion for summary judgment was filed by Santa Monica, Susan McCarthy, Santa Monica City Manager, and James Butts, Santa Monica Chief of Police. We refer to appellees collectively as "Santa Monica."

**[1]** As Food Not Bombs recognizes, the February 24, 2004 amendments to the street banner ordinance render the original challenge to that ordinance — premised on the distinctions drawn by providing exceptions for some private speech but not others — no longer viable. By precluding all private parties from putting up street banners and limiting such "bannering" to the City itself, the Council has now closed the designated public forum in which appellants sought to exercise their rights. *See Currier v. Potter*, 379 F.3d 716, 728 (9th Cir. 2004) (noting that the government may close a designated public forum "whenever it wants"), *cert. denied sub nom. Seattle Hous. & Res. Effort v. Potter*, 125 S. Ct. 2935 (2005); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("[A] state is not required to indefinitely retain the open character of the [designated public forum] . . . ."). As the challenge to the street banner ordinance is moot, we vacate the district court's judgment insofar as it upheld the validity of that ordinance. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24-25 (1994) (noting that vacatur is appropriate where "mootness results from unilateral action of the party who prevailed below"); *Internal Revenue Serv. v. Pattullo (In re Pattullo)*, 271 F.3d 898, 902 (9th Cir. 2001) (same).

**[2]** Similarly, as Food Not Bombs also recognizes, amendments made subsequent to the filing of this suit render moot the challenge to the food distribution ordinance concerning city sidewalks, SMMC § 5.06.020. That ordinance as it now stands allows appellants to do precisely what they sought to do — engage in non-commercial food distribution on public sidewalks. As appellants have therefore abandoned any challenge to this food distribution ordinance, we vacate the district court's judgment insofar as it upheld its validity.

**[3]** While Food Not Bombs' First Amendment challenge to the ordinance concerning distribution of food in public parks, SMMC § 5.06.010, is not moot, a facial challenge to that ordinance is not available. Food Not Bombs does not argue that

food distribution is on its face an expressive activity. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."); *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996) ("By its terms, the ordinance here prohibits only sitting or lying on the sidewalk. . . . [T]hese are not forms of conduct integral to, or commonly associated with, expression. We therefore reject plaintiffs' facial attack on the ordinance."). Whether food distribution can be expressive activity protected by the First Amendment under particular circumstances is a question to be decided in an as-applied challenge, should one be brought. *See S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1135 (9th Cir. 2004) ("[A] facial challenge is proper only if the statute by its terms seeks to regulate spoken words or patently expressive or communicative conduct, such as picketing or handbilling, or if the statute significantly restricts opportunities for expression." (citations omitted)), *cert. denied*, 126 S. Ct. 367 (2005); *Nordyke v. King*, 319 F.3d 1185, 1189 (9th Cir. 2003) (noting that the inquiry into whether the possession of firearms is an expressive activity is best suited to an as-applied challenge).

**[4]** Food Not Bombs' challenge also asserts state preemption of SMMC § 5.06.010.[12] Under California law, " '[a] conflict [between a local ordinance and state law] exists [only] if the local legislation [1] duplicates, [2] contradicts, or [3] enters an area fully occupied by general law, either expressly or by legislative implication.' " *S.D. Meyers, Inc. v. City & County of San Francisco*, 336 F.3d 1174, 1177 (9th Cir. 2003) (last four alterations in original) (quoting *Sherwin-Williams Co. v. City of Los Angeles*, 844 P.2d 534, 536 (Cal. 1993)). The food distribution ordinance does not substantively dupli-

---

[12]It is clear that appellants, who regularly distribute food in city parks, have standing to assert this portion of their argument.

cate or contradict state law; it simply states, for the public's information, that state law pertaining to food distribution applies in Santa Monica's public parks and on the City Hall lawn. SMMC § 5.06.010 (providing that distributors of free food must comply with "[a]pplicable State health and safety standards regulating food service and distribution"). The ordinance also does not duplicate or contradict the enforcement provisions of state law, as it includes no provision regarding the enforcement of state law. In any event, the state law enforcement provision vests primary enforcement authority in local agencies. *See* CAL. HEALTH & SAFETY CODE § 113725.[13] Finally, it is not at all clear that the preemption provision cited by Food Not Bombs, *id.* § 113705, even applies to this sort of ordinance, as it purports to preempt only local regulation of "retail food facilities." Because it adds no substantive regulations and contains no enforcement provisions, the ordinance does not intrude on the field covered by the state law health and safety preemption provision.

## B. The Community Events Ordinance

The remaining challenges in this case concern various sections of the Community Events Ordinance, SMMC §§ 4.68.010-.220.

### 1. *Standing*

[5] To maintain their challenge to the provisions of the Events Ordinance, or the implementing administrative interpretation, appellants must establish constitutional standing with regard to the provisions challenged. *See Allen v. Wright*, 468 U.S. 737, 750-51 (1984). To do so, they must allege (1) a "distinct and palpable" injury-in-fact that is (2) "fairly traceable" to the challenged provision or interpretation and (3)

---

[13]Section 113725 provides: "[p]rimary responsibility for enforcement of this chapter shall be with local health agencies." CAL. HEALTH & SAFETY CODE § 113725.

would "likely . . . be redressed" by a favorable decision. *Id.* at 751 (internal quotation marks omitted).

Additionally, special standing principles apply in First Amendment cases. Facial constitutional challenges come in two varieties: First, a plaintiff seeking to vindicate his own constitutional rights may argue that an ordinance "is unconstitutionally vague or . . . impermissibly restricts a protected activity." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998); *see Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997) ("Plaintiffs may seek directly on their own behalf the facial invalidation of overly broad statutes that 'create an unacceptable risk of the suppression of ideas . . . .' " (quoting *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 965 n.13 (1984))). Second, "an individual whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1984); *see NAACP v. City of Richmond*, 743 F.2d 1346, 1352 (9th Cir. 1985). The former sort of challenge — which, as will become clear, is what we have here — may be paired with the more common as-applied challenge, where a plaintiff argues that the law is unconstitutional as applied to his own speech or expressive conduct. *See Foti*, 146 F.3d at 635; *see also City of Richmond*, 743 F.2d at 1352 ("[The NAACP] argues both that its own activity is protected by the first amendment and that the Richmond ordinance impermissibly suppresses the speech of all potential marchers."). It is within this framework that appellants must and do establish standing.

ANSWER organizes marches and demonstrations and has obtained permits to do so in other localities besides Santa Monica. Its intended activities arguably require a permit under SMMC § 4.68.040, both because the activities are often "marches" or "assemblies" and because ANSWER publicizes events widely to ensure maximum attendance. ANSWER specifically avers that it would like to hold a march that starts in

Santa Monica and has pursued other locations only because of the burden of the City's permit requirements. ANSWER also declares that its practice of organizing spontaneous events is inconsistent with Santa Monica's spontaneous expression exception, SMMC § 4.68.040(g), because it may want to hold a spontaneous event that is close to the target of its protest.

That ANSWER has never applied for a permit under the Events Ordinance does not destroy its standing. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988) ("[O]ne who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."). Furthermore, ANSWER avers that it has modified its behavior (by choosing locations other than Santa Monica for events) because of Santa Monica's permit requirements. *See Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) ("[I]t is 'sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff.' " (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000) (internal quotation marks and citation omitted))).

**[6]** In short, ANSWER's apprehension that the Events Ordinance would be enforced against it for engaging in activities protected by the First Amendment without a permit is sufficient to establish an injury-in-fact and support a facial challenge. The remaining prongs of the constitutional standing requirements are also met, as the injury alleged is "fairly traceable" to the Events Ordinance and would likely be redressed by a decision in appellants' favor. ANSWER therefore has standing to bring a facial challenge to the Events Ordinance on its own behalf. *See id.* at 1007.

Appellants also seek to assert the rights of third parties not present to the litigation through an overbreadth facial challenge to the Events Ordinance. We need not address the avail-

ability of such a challenge, as ANSWER has standing to bring a facial challenge to all the pertinent aspects of the ordinance on its own behalf. *See Nunez*, 114 F.3d at 949 (noting that "whether the 'overbreadth doctrine' applies to [plaintiffs'] First Amendment challenge is more of a technical academic point than a practical concern").

**[7]** As we conclude that ANSWER has standing, there is no need to inquire further about the injury-in-fact standing of the other appellants. *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 918 (9th Cir. 2004), *cert. denied*, 125 S. Ct. 1694 (2005).

> 2.  *Permitting    Requirements    Under    the    Events Ordinance*

> a.   *Review Includes the Administrative Instruction*

Before addressing the merits of Food Not Bombs' challenge to the Events Ordinance, we must take another detour and address the scope of this facial challenge. At oral argument, there was some confusion over the role played by the Administrative Instruction. On the one hand, the Events Ordinance does call for promulgation of "administrative regulations that are consistent with and that further the terms and requirements set forth within this Chapter." SMMC § 4.68.200. On the other hand, counsel for Santa Monica stated that although available to the public online, the Instruction principally is meant to bind staff in their application of the Events Ordinance, including as a prosecutorial directive. Appellants' counsel, for her part, maintained that the Events Ordinance, not the Instruction, informs the public as to what the law is.

In like circumstances, it is common to consider a city's authoritative interpretation of its guidelines and ordinances. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we

must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."); *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989) ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for '[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.' " (quoting *Hoffman Estates v. The Flipside*, *Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982) (alterations in original))). To affect the constitutional analysis, such a limiting construction must "be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood*, 486 U.S. at 770.

**[8]** The district court found that "[t]he City has adopted Administrative Instruction II-4-4 . . . as amended July 7, 2003, to provide specific standards and guidelines for implementation of the Community Events Ordinance." *See Ward*, 491 U.S. at 795 (looking to district court's express findings). The Instruction is thus binding on the City's enforcement staff, as well as explicitly authorized by the ordinance. That the Instruction has been amended a number of times does not affect its pertinence, as the amendments, like the original Instruction, are publicly available. The Instruction is therefore properly viewed as Santa Monica's authoritative interpretation of the Events Ordinance, and we review the constitutionality of the ordinance in light of the Instruction.

      b.   *Breadth of the Advance Notice and Permitting Requirements*

**[9]** The Events Ordinance applies to " 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks." *United States v. Grace*, 461 U.S. 171, 177 (1983). Such places "are considered, without more, to be 'public forums.' " *Id.*; *Hague v. CIO*, 307 U.S. 496, 515 (1939) ("[S]treets and parks . . . have

immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."); *Grossman v. City of Portland*, 33 F.3d 1200, 1204 (9th Cir. 1994) (describing public parks as "the quintessential public forums" (internal quotation marks and citation omitted)).

[10] Notwithstanding the primacy of such areas as locations for communicative activity among citizens, "in order to regulate competing uses of public forums, [local governments] may impose a permit requirement on those wishing to hold a march, parade, or rally." *Forsyth County*, 505 U.S. at 130. Such control, however, "[must be] exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941). As traditional public fora, parks, sidewalks, and streets "provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards." *Grossman*, 33 F.3d at 1205. Those fora must not be regulated too restrictively, lest they become unavailable to those who have little or no recourse to other, often costly, areas for public discourse.

[11] At the same time, although schemes imposing prior restraints on protected speech face a "heavy presumption against validity," *Forsyth County*, 505 U.S. at 130 (internal quotation marks omitted), time, place, and manner regulations of speech in public areas bear a somewhat lighter burden, so long as they are content neutral. *See id.*; *see also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002). Their purpose is the coordination of use, not the preclusion of particular expression. Although Food Not Bombs maintains otherwise, it is apparent that under *Thomas*, the Events Ordinance must

be viewed as a content-neutral time, place, and manner permitting scheme, not as a scheme imposing "subject matter censorship" through prior restraint. *See Thomas*, 534 U.S. at 322-23 (" 'A licensing standard which gives an official authority to censor the content of a speech differs *toto coelo* from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like.' " (quoting *Niemotko v. Maryland*, 340 U.S. 268, 282 (1951) (Frankfurter, J., concurring in result))).

This conclusion is compelled by the marked parallels between the Events Ordinance and the ordinance at issue in *Thomas*. In reaching its conclusion that the *Thomas* permitting ordinance was subject to review under the standard applied to time, place, and manner regulations, the Supreme Court noted that (1) "[n]one of the grounds for denying a permit has anything to do with what a speaker might say"; (2) "the ordinance (unlike the classic censorship scheme) is not even directed to communicative activity as such, but rather to *all* activity conducted in a public park"; and (3) the object of the permitting scheme was "to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event" rather than to exclude expression based on any particular content. *Id.* at 322. Although the Events Ordinance differs from that in *Thomas* in certain respects, it shares these three characteristics. Additionally, the provision laying out the criteria governing the issuance of permits under the Events Ordinance concludes:

> In deciding whether to approve an application, no consideration may be given to the message of the event, the content of speech, the identity or associational relationships of the applicant, or to any assumptions or predictions as to the amount of hostility which may be aroused in the public by the content of speech or message conveyed by the event.

SMMC § 4.68.060.[14] The Events Ordinance thus falls more comfortably under the purview of the content-neutral time, place, and manner regulation category subject to intermediate scrutiny, than it does under that of the content-based prior restraint category. Like the ordinance in *Thomas*, " '[t]he [permit] required is not the kind of prepublication license deemed a denial of liberty since the time of John Milton but a ministerial, police routine for adjusting the rights of citizens so that the opportunity for effective freedom of speech may be preserved.' " *Thomas*, 534 U.S. at 323 (second alteration in original) (quoting *Poulos v. New Hampshire*, 345 U.S. 395, 403 (1953)).

"[E]ven content-neutral time, place, and manner restrictions," however, "can be applied in such a manner as to stifle free expression." *Id.* In particular, "[a]dvance notice or registration requirements [can] drastically burden free speech." *Rosen v. Port of Portland*, 641 F.2d 1243, 1249 (9th Cir. 1981). The restrictions therefore "must meet certain constitutional requirements." *Forsyth County*, 505 U.S. at 130. Such restrictions (1) must not delegate overly broad discretion to a government official; (2) must not be based on the content of the message; (3) must be narrowly tailored to serve a significant governmental interest; and (4) must leave open ample alternatives for communication. *Id.*; *see also Galvin v. Hay*, 374 F.3d 739, 746 (9th Cir. 2004).[15]

---

[14]Appellants do not raise a discrete challenge to any specific criterion as providing undue discretion to administrators to engage in content-based determinations, presumably in light of this provision.

[15]Although the ordinance at issue in *Thomas* had many features similar to those challenged here, "[t]he Court in *Thomas* considered only a challenge to the breadth of official discretion, not '[the other] requirements of [the] time, place, and manner jurisprudence.' " *Galvin*, 374 F.3d at 747 n.5 (quoting *Thomas*, 534 U.S. at 323 n.3); *see also Thomas*, 534 U.S. at 323 ("Where the licensing official enjoys unduly broad discretion in determining *whether to grant or deny a permit*, there is a risk that he will disfavor speech based on its content." (emphasis added)). Appellants here challenge the "other" requirements of time, place, and manner jurisprudence, explicitly not at issue in *Thomas*.

**[12]** As noted, Food Not Bombs does not identify any of the permitting criteria as containing a grant of overly broad discretion. Food Not Bombs, however, does argue that the Events Ordinance, as implemented by the Instruction, allows for content-based application because it treats expressive events more favorably than others. The Instruction, however does not distinguish *among* the expressive events based on their content, and therefore satisfies the content-neutrality requirement for valid, time, place, and manner regulations. *See City of Richmond*, 743 F.2d at 1354 ("The [parade] ordinance requires all speakers, *regardless of the content of their message*, to provide . . . advance notice . . . ." (emphasis added)); *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1155 (9th Cir. 2003) ("A rule is content-neutral if it is unconcerned with the literal content of the spoken or written words. . . . [S]peech-regulating rules are content-neutral when the rule is not related to the subject or topic of the speech." (internal quotation marks and citation omitted)). We therefore consider whether the challenged provisions of the Events Ordinance are narrowly tailored and leave open ample alternatives for communication.

### (1)   Narrow Tailoring

**[13]** A narrowly-tailored permitting regulation need not be the least restrictive means of furthering a locality's asserted interests. The regulation may not, however, burden substantially more speech than necessary to achieve a scheme's important goals. *See United States v. Baugh*, 187 F.3d 1037, 1043 (9th Cir. 1999). "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

As we have noted, local governments can exercise their substantial interest in regulating competing uses of traditional public fora by imposing permitting requirements for certain

uses. *See Cox*, 312 U.S. at 574 ("The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend."); *Rosen*, 641 F.2d at 1247 ("The governmental interest in regulating parades, when *large* groups use public streets and disrupt traffic by causing major arteries to be closed and transportation rerouted, is apparent." (emphasis added)); *Grossman*, 33 F.3d at 1206 ("Some type of permit requirement *may* be justified in the case of large groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial.").

Food Not Bombs advances two reasons why the Events Ordinance is not sufficiently narrowly tailored to those substantive interests: First, Food Not Bombs contends that because the advance notice permit requirement is applicable to groups smaller than 150, the Events Ordinance does not advance the asserted governmental interest relating to the use of public spaces by large groups. Second, Food Not Bombs questions whether the temporal aspect of the two-day advance notice requirement is sufficiently narrowly tailored. We address each contention in turn.

(a)   As to the first point — the claimed ill-fit with the asserted governmental interests — Food Not Bombs points to two different aspects of the Events Ordinance, one pertaining to the use of streets, sidewalks, and park paths for marches and similar events and the other applicable to gatherings in parks and other public spaces.

(i)   First, under SMMC § 4.68.040(a), a permit is required for:

> A parade, procession, march or assembly consisting of persons, animals, vehicles, or any other combina-

tion thereof, which is to assemble or travel in unison on *any public street, highway, alley, sidewalk or other City-designated public way* and which either (1) *may impede*, *obstruct, impair or interfere* with free use of such public street, highway, alley, sidewalk, or other public way owned, controlled, or maintained by the City or (2) does not comply with the normal or usual traffic regulations or controls . . . .

(emphases added).

Pursuant to the Instruction, "[a] march, procession, walk, run, or assembly on public sidewalks or City park paths [is] . . . required to obtain a . . . [permit] only if it is *likely to*: interfere with the free use of any public way . . . or not comply with traffic regulations." Instruction at 23 (Section V(4)) (emphasis added). The Instruction also provides a "safe harbor" to groups potentially affected by this provision, which applies to only sidewalks and park paths:

> [A] march, procession, walk, run or assembly, will not interfere with the free use by others of *a public sidewalk or City park path* and is not required to obtain a Community Event Permit if the total group consists of 500 or fewer participants and if all participants: [(1)] [a]ssemble, march, walk, or run in groups of less than 50, 2 abreast (to create spacing between groups), and give way to others they encounter on the public way[;] [(2)] do not obstruct traffic flow[; ] [(3)] *obey all traffic regulations*[;] [and (4)] obey all park regulations.

*Id.* (Section V(4)(a)) (emphases added). Additionally, no permit is required for marches, processions, walks, and runs on public sidewalks and park paths involving more than 500 but fewer than 2,000 people, if the event otherwise complies with the safe harbor requirements and, in addition, the start times

are staggered, the group gathers at the start and finish of the event on private property, and the organizers plan for the parking needs of the event participants. *Id.* (Section V(4)(b)).

With respect to public ways other than sidewalks or park paths — essentially, roadways of any kind — the Instruction contains no limiting construction specifying that permits are required only for events "likely" to interfere with free use of the road. Nor does the Instruction contain any specification concerning when an event on a street, as distinct from a sidewalk or park path, "may impede, obstruct, impair or interfere" with the free flow of traffic. Instead, for such locations the Ordinance applies to groups of any size and to any street in the City, and applies without regard to the group's expectation of interference with the free flow of vehicular traffic or to whether interference actually occurs.

**[14]** Food Not Bombs argues that because it lacks an explicit numerical floor, SMMC § 4.68.040(a), as implemented by the Instruction, potentially applies to activities of small groups of people traveling "in unison" even when the activities of such small groups do not significantly interfere with the public's use of streets, sidewalks, and park paths, and is therefore insufficiently narrowly tailored. Absent the implementing Instruction pertaining to sidewalks and park paths, we would agree. As the cautionary language in our earlier opinions indicates, the significant governmental interest justifying the unusual step of requiring citizens to inform the government in advance of expressive activity has always been understood to arise only when large groups of people travel together on streets and sidewalks. *See Rosen*, 641 F.2d at 1247; *see also Grossman*, 33 F.3d at 1206; *City of Richmond*, 743 F.2d at 1355. Small groups, however, can also "march" and "assemble" for expressive purposes, and can do so without interfering with the free flow of traffic (except in the trivial respect that anyone walking on a public sidewalk or roadway takes up space and therefore prevents someone else from traveling precisely the same route). Without a provision

limiting the permitting requirements to larger groups, or some other provision tailoring the regulation to events that realistically present *serious* traffic, safety, and competing use concerns, significantly beyond those presented on a daily basis by ordinary use of the streets and sidewalks, a permitting ordinance is insufficiently narrowly tailored to withstand time, place, and manner scrutiny.

The Sixth Circuit recently so held in *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600 (6th Cir. 2005). In *City of Dearborn*, the court considered an ordinance that applied to "special events," defined as "any walkathon, bikeathon, or jogging group or other organized group having a common purpose or goal, proceeding along a public street or other public right-of-way." *Id.* at 608. The Dearborn ordinance provided that all "special events," no matter the size, had to apply for a permit, which would then be granted if the city council determined that the event "[would] not in any manner act so as to breach the peace or unnecessarily interfere with the public use of the streets, sidewalks, parks and public areas . . . ." *Id.* at 603. Importing the analysis employed in *Grossman* (which concerned small groups in public *parks*) to apply to the Dearborn ordinance (which covered "special events" in *streets*, *parks, and public areas*), the court observed that "[p]ermit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *Id.* at 608. The court held that the Dearborn ordinance was "hopelessly" overbroad because it applied, as does the ordinance here, to "any procession of people with a common purpose or goal, whether it be a small group of protestors or a group of senior citizens walking together to religious services." *Id.* As such, the Dearborn ordinance was not narrowly tailored because:

> The city of Dearborn's significant interest in crowd and traffic control, property maintenance, and protection of the public welfare is not advanced by the

application of the Ordinance to small groups. In most circumstances, the activity of a few people peaceably using a public right of way for a common purpose or goal does not trigger the city of Dearborn's interest in safety and traffic control.

*Id.* (citations omitted). The *City of Dearborn* court also took umbrage with the fact that the ordinance required small groups to seek a permit in the first instance; only *after* a permit was sought was the city council authorized to issue permits to those events that it found would not "*unnecessarily interfere* with the public use of the streets, sidewalks, parks and public areas." *Id.* at 603 (emphasis added) (internal quotation marks omitted). In other words, the Dearborn ordinance presumed an interference with government interests, even when common sense would dictate otherwise.

**[15]** We find the reasoning in the *City of Dearborn* persuasive and hold that a narrowly tailored permit requirement must maintain a close relationship between the size of the event and its likelihood of implicating government interests. With respect to streets and sidewalks, as distinct from other public areas, SMMC § 4.68.040(a), like the Dearborn ordinance, contains no restriction as to the size of the group. It does, however, provide that organizers of only two sorts of group events must apply for a permit: (1) those that "may impede, obstruct, impair or interfere" with the free flow of traffic or (2) those that "do[ ] not comply with the normal or usual traffic regulations or controls." SMMC § 4.68.040(a). The second permit trigger is narrowly tailored, as its application is limited only to events that *actually* implicate the governmental interest in enforcement of established traffic regulations. The first permit trigger, however, standing alone, is not narrowly tailored under our precedents and *City of Dearborn*, because it lacks any specification as to the size of the group covered and contains no other sufficiently close tie to the government interest in the free flow of traffic.

As with the criterion relating to the violation of traffic regulations, it would have been simple enough to tailor the permitting requirement to marches, processions and assemblies that the organizer expects or intends *actually* to impede traffic flow. Other similar Santa Monica ordinances are so limited. *See id.* § 5.06.020 (specifying that no permit is required for "noncommercial food distribution that *does not interfere* with the free use of the sidewalk or street" (emphasis added)); *id.* § 3.12.810 (prohibiting any pedestrian from "stand[ing] in any roadway or street other than in a safety zone or in a cross walk *if such action interferes* with the lawful movement of traffic" (emphasis added)). The Events Ordinance, however, instead requires organizers of marches, processions and assemblies, with no further guidance and no limitation as to the size of the group, to project in advance whether their event on a public street or sidewalk "may" prove an impediment to the free flow of traffic.

"May" is a term of nearly infinite elasticity, given the unbounded variety of human events. While many things are quite unlikely to happen, almost anything physically possible "may" happen. Thus, while "[i]n most circumstances, the activity of a few people peaceably using a public right of way for a common purpose or goal does not trigger the city['s] . . . interest in safety and traffic control," *City of Dearborn*, 418 F.3d at 608, unforeseen circumstances "may" result in unintended and unexpected impediment of traffic. For example, a member of the group could injure herself, necessitating emergency services, or the street or sidewalk could be especially crowded that day for reasons not connected with the group's activities and not predictable. As no organizer of a small group event can rule out that any of these circumstances "may" occur, events will be subject to the permitting requirement even though, in the vast majority of instances, there will in fact be no interference with the quotidian traffic norm.

The term "may," in other words, simply takes in too many circumstances that do not, as matters actually turn out, impli-

cate the governmental interests justifying the permitting requirement. The "may impede" requirement thus does not prove a meaningful operational distinction between Santa Monica's Events Ordinance and the ordinance struck down in *City of Dearborn*, and does not cure the absence of any limiting group size threshold.

We observe as well that there are obvious alternative ways the City could adjust the Events Ordinance so that it is appropriately tailored to its asserted interests. A group size specification or a limitation to actual impediment, using language similar to the Food Ordinance, are two examples already mentioned. Other possibilities might include a focus on whether the group *plans* to interfere with traffic; specification of a significantly heightened probability of impediment or obstruction, beyond what "may" happen; or a prohibition on walking or assembling directly in the path of traffic on specified roadways.

Time, place, and manner restrictions need not, of course, be the least restrictive alternative available. *See Ward*, 491 U.S. at 798. As we have observed in the past, however, where there are easily available alternative modes of regulation that both satisfy the government's substantial, legitimate concerns and affect considerably less speech than the mode chosen, we are likely to conclude, as we do here, that the governmental restriction sweeps in substantially more speech than is necessary to meet the government's concerns. *See Galvin*, 374 F.3d at 753.

**[16]** With respect to sidewalks and public paths, however, the Instruction does contain a limiting construction of the "may impede" requirement. That construction limits the application of the "may impede" requirement for sidewalks and park paths to circumstances in which interference is "likely." Instruction at 23 (Section V(4)). It also specifies conditions under which even relatively large groups can demonstrate without being deemed "likely" to interfere with the flow of

traffic. *Id.* We conclude that these two clarifying additions to the Events Ordinance sufficiently limit the permit requirement to those situations in which the significant governmental interests in regulating conflicting uses of sidewalks and public paths are in play.

The "likely to interfere" standard provides an objective standard that, as we read it, applies when a reasonable person viewing the situation in advance would anticipate significant interference with the ordinary flow of traffic.[16] Whether an event meets the "likely to interfere" standard will turn on the reasonable expectations of the organizers of the event, given the size of the group, the precise plans for the event, whether the intention is to block traffic or to avoid doing so, and the predictable conditions at the location and time the organizers have chosen. The safe harbor provision, in turn, does not *require* groups engaged in expressive activity to abide by its standards, but does establish a definitely ascertainable standard that, if followed, eliminates any possibility that interference will be considered "likely."

This combination of a general but narrow standard with a more specific alternative makes for a close fit with the governmental interests underlying the permitting requirement. As noted above, another approach would be to articulate the requirement in terms of *actual* interference. But permits must be obtained in advance. A forward-looking standard that focuses on a reasonable prediction that there will be — not just might be — actual interference adjusts for that consideration while not encompassing substantially more speech than necessary to meet the governmental interests underlying the permitting requirement.

---

[16]Food Not Bombs does not independently challenge the "interfere" standard. Our understanding is that the Instruction uses "likely to interfere" as shorthand for "likely to impede, obstruct, impair, or interfere," and that that litany, taken as a whole, applies only to activities that significantly alter the usual flow of traffic, making it difficult or impossible for citizens to reach their destinations without hindrance.

**[17]** We conclude that the Instruction provides an adequate limiting construction of SMMC § 4.68.040(a) as applied to sidewalks and park paths; but, with respect to all other city streets and public ways, SMMC § 4.68.040(a) is insufficiently narrowly tailored to withstand constitutional scrutiny.

(ii)   Food Not Bombs' second narrow tailoring challenge concerns subsection (b) of SMMC § 4.68.040. This subsection applies to those events not subject to subsection (a) — that is, not occurring on streets, sidewalks, or public ways — which involve "one hundred fifty or more persons on City owned, controlled, or maintained property."

In public open spaces, unlike on streets and sidewalks, permit requirements serve not to promote traffic flow but only to regulate competing uses and provide notice to the municipality of the need for additional public safety and other services. Only for quite large groups are these interests implicated, so imposing permitting requirements is permissible only as to those groups. *See Grossman*, 33 F.3d at 1205-08 (finding permit requirement potentially applicable to groups as small as six to eight people insufficiently narrowly tailored); *see also Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) (expressing doubt that application of a permit requirement to groups with as few as ten people is sufficiently narrowly tailored).

**[18]** Groups of 150 or more, whether demonstrating or playing soccer, are by any measure sufficiently large enough to affect or "have an impact on" the use of Santa Monica's public spaces by other citizens and therefore to implicate the City's interest in maintaining the safe and compatible use of limited public open space. *See Thomas*, 534 U.S. at 322 ("[T]o allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech." (alteration in original) (internal quotation marks omitted)). We therefore hold that, standing alone, the subsection (b) permit requirement, applicable only to groups of 150

or more, is narrowly tailored to Santa Monica's governmental interest in allocating use of Santa Monica's public open space among competing groups of citizens.[17]

[19] The related Instruction, however, fatally undermines this narrow tailoring by mandating that "any activity or event which the applicant intends to advertise in advance via radio, television and/or widely-distributed print media shall be deemed to be an activity or event of 150 or more persons." Instruction at 5 (Section III(1)(b)). This provision does more than simply advise potential event organizers that when they advertise they cannot be sure of the number of attendees and that, if more than 149 people *actually* attend, they will be held to the permit requirement. Were it so drafted, the Instruction would simply implement the large group trigger, and its validity would not be in question. The "shall be deemed" language of the Instruction, however, precludes reading it as advisory. Instead, the language creates a per se rule, rendering any advertised event a qualifying one *whether or not* 150 or more people actually attend. As written, the Instruction detaches the Events Ordinance from the asserted interest of the City in allocating use of public open space by large groups.[18]

---

[17]Whether 150 people is the outside limit for a permitting requirement is a question we do not decide, except to caution that a substantially lower number may well not comport comfortably with the limited governmental interests at play in public parks and open spaces.

[18]We note that advertising an event in broadly available media is itself a form of expression protected by the First Amendment. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981). To require a permit simply because an event is advertised is in effect to require a permit *to* advertise, based on the content of that advertisement. Whether this application of the Instruction runs afoul of the First Amendment for reasons independent of its impact on speech in public fora has not been raised by the parties, and we need not decide the question here. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983) ("With respect to noncommercial speech, this Court has sustained content-based restrictions only in the most extraordinary circumstances.").

**[20]** We conclude that, as implemented by the Instruction, SMMC § 4.68.040(b) is not a narrowly tailored time, place, and manner restriction and cannot be enforced. Without the advertising trigger, however, SMMC § 4.68.040(b) passes constitutional muster.

**[21]** (b)   We next consider whether the two-day advance notice requirement applicable to Category 3 events, those events not encompassed within Categories 1 and 2, is narrowly tailored.

As noted by the Seventh Circuit:

> [T]he length of the required period of advance notice is critical to its reasonableness; and given that the time required to consider an application will generally be shorter the smaller the planned demonstration and that political demonstrations are often engendered by topical events, a very long period of advance notice with no exception for spontaneous demonstrations unreasonably limits free speech.

*Church of the Am. Knights of the Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003). Courts, including ours, have struck down a variety of advance notice requirements on the ground that the length of the required notice period was too long. *See, e.g.*, *City of Dearborn*, 418 F.3d 606-07 (striking down a thirty-day advance notice requirement for events in parks, on streets, or in other public areas); *City of Gary*, 334 F.3d at 682-83 (striking down a forty-five-day advance notice requirement for demonstrations on city streets or public property); *Douglas*, 88 F.3d at 1523-24 (striking down a five-day advance notice requirement for processions of ten or more persons on streets, sidewalks, and public ways on the grounds that it was unjustifiably long and applied to groups as small as ten); *City of Richmond*, 743 F.2d at 1356-57 (striking down a twenty-day advance notice requirement for parades).

**[22]** Conversely, ordinances requiring fewer than three days advance notice of large expressive events *have* survived challenge. *See, e.g.*, *A Quaker Action Group v. Morton*, 516 F.2d 717, 735 (D.C. Cir. 1975) (approving a two-day advance notice requirement for planned public gatherings on a designated area on the grounds of the White House); *Powe v. Miles*, 407 F.2d 73, 84 (2d Cir. 1968) (upholding a two-day advance notice requirement); *Local 32B-32J v. Port Auth. of N.Y. & N.J.*, 3 F. Supp. 2d 413, 417-22 (S.D.N.Y. 1998) (upholding a thirty-six-hour advance notice requirement for expressive activity in the World Trade Center and Port Authority Bus Terminal).

Food Not Bombs offers two cases in support of its argument that the two-day advance application requirement is not narrowly tailored. Both cases — one from our circuit and one from the Seventh Circuit — involved substantially longer notice requirements than the requirements imposed by the Events Ordinance.

In *City of Richmond*, we held that a twenty-day advance notice requirement was not the "least restrictive means" for protecting the city's asserted interests. 743 F.2d at 1357.[19] In so holding, however, we reviewed ordinances from other cities with significantly shorter advance notice requirements, suggesting that an ordinance with an advance notice requirement that was quite short could pass muster. *See id.* at 1356-57 (citing twenty-four-hour, thirty-six-hour, two-day, and three-day provisions).[20]

---

[19]In *Ward*, decided after *City of Richmond*, the Supreme Court rejected the use of the least restrictive means analysis and reaffirmed that "the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 798-99 (alteration in original) (internal quotation marks omitted).

[20]At oral argument, counsel indicated that *City of Richmond* had served as the guidepost for the City's two-day advance notice provision.

In *City of Gary*, our sister circuit struck down a forty-five-day advance permit application requirement that applied to parades, rallies, or demonstrations of groups as small as fifty. 334 F.3d at 682-83. The court noted the "reasonableness in general of requiring that a permit to hold a demonstration on city streets be sought in advance of events" but found that the challenged ordinance suffered from two detectible infirmities: (1) it failed to incorporate the notion that the smaller the planned demonstration, the less time a city would need to process a permit application, and (2) it provided no exception for spontaneous demonstrations. *Id.* at 682.

**[23]** These two cases, while disapproving of long advance notice provisions, do not lead us to question Santa Monica's two-day requirement. The two-day period (seventy-two-hour period, if an applicant needs a permit from the Fire or Building and Safety Departments) accords with Santa Monica's significant governmental interests by (1) providing a coordinated process for managing community events in heavily burdened and limited public space, and (2) ensuring that qualifying events, which often require the provision of public services, do not impede traffic on sidewalks and busy streets without the benefit of advance notice to the City. It does take *some* time to coordinate the various demands on the streets, sidewalks, and parks; assess what services (such as additional police) are needed; contact those services; ensure their availability; and allow those services to prepare for the events. Santa Monica's requirement, while not the shortest possible, is nearly so. Given that a two-day advance permit requirement accords with the few advance permitting ordinances previously cited with approval by federal courts; that it includes an exemption for spontaneous events, discussed below; and that, on the present record, the notice requirements have not in practice constricted substantial amounts of spontaneous expression, we hold that the two-day notice, on its face, is sufficiently narrowly tailored.

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
February 14, 2005—Pasadena, California

Filed June 16, 2006

Before: Andrew J. Kleinfeld, Kim McLane Wardlaw, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Partial Majority Opinion, Partial Concurrence, and
Partial Dissent by Judge Kleinfeld;
Concurrence by Judge Wardlaw

---

### (2)   Ample Alternatives

We now consider whether the permitting provisions pre-serve ample alternative means for communicating protected expression. As we recently stated, "[i]n the 'ample alterna-tives' context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication." *Menotti v. City of Seattle*, 409 F.3d 1113, 1141 (2005) (quot-ing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986)); *see Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 866 (9th Cir. 2001) ("If an ordinance effectively prevents a speaker from reaching his intended audience, it fails to leave open ample alternative means of communication."); *Galvin*, 374 F.3d at 755-56 (noting that the ample alternatives prong can also require an opportunity to speak at a location con-nected to the message conveyed).

Santa Monica's spontaneous events exception provides that "[s]pontaneous events which are occasioned by news or affairs coming into public knowledge less than forty-eight

hours prior to such event may be conducted on the lawn of City Hall without the organizers first having to obtain a Community Event Permit." SMMC § 4.68.040(g). Practically speaking, this exception is necessary only for groups that would otherwise require a permit — that is, events falling under section 4.68.040(a) that do not or cannot avail themselves of the Instruction's safe harbor, or events falling under section 4.68.040(b) because they take place in parks or public spaces and involve more than 150 people.

Echoing the statement that "[public] protests frequently occur in response to topical events, and [as such] their effectiveness may depend on both their immediacy and the forum where they take place," *City of Richmond*, 743 F.2d at 1350, Food Not Bombs stakes out the position that the Events Ordinance fails to preserve ample alternative means of communication because the exception for spontaneous events (1) hinges on how recently a matter entered into public knowledge and (2) forecloses affected groups from choosing the location of their spontaneous expression.[21]

The spontaneous expression exception *expands* the amount of free expression otherwise allowed in public fora under the Events Ordinance. It makes little sense, therefore, to consider whether the exception itself is sufficiently narrowly tailored to the asserted governmental interests. Instead, what we must consider is whether the Events Ordinance advance notice requirement, including the spontaneous expression exception, overall provides adequate alternatives for expression, both planned and spontaneous.

The strong interest in protecting the opportunity for spontaneous expression in public fora with respect to individuals or small groups has been emphasized by prior cases. *See, e.g.,*

---

[21]Food Not Bombs also advances similar arguments in support of its contention that the spontaneous events clause is not narrowly tailored. Because the arguments are duplicative, we address them all in this section.

*Watchtower Bible & Tract Soc'y, of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165-66 (2002) ("It is offensive — not only to the values protected by the First Amendment, but to the very notion of a free society — that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."); *Grossman*, 33 F.3d at 1206-07 (noting the importance of preserving the ability of small groups to engage in spontaneous expression). Less conclusively decided is the question whether this First Amendment interest in spontaneous expression is similarly strong with respect to large groups or mass conduct. *See Bayless*, 320 F.3d at 1007-14 (striking down a twenty-four-hour advance notice requirement, applicable to political action campaigns, as an impermissible burden on protected speech); *Rosen*, 641 F.2d at 1247-48 (striking down an advance notice requirement *because* it reached the conduct of small groups and individuals).[22]

**[24]** Advance notice or permitting requirements do, by their very nature, foreclose spontaneous expression. *See Grossman*, 33 F.3d at 1206 (recognizing that "because of the delay caused by complying with the permitting procedures, [i]mmediate speech can no longer respond to immediate issues" (alteration in original) (internal quotation marks omitted)); *City of Richmond*, 743 F.2d at 1355 ("[T]he delay inherent in advance notice requirements inhibits speech. By requiring advance notice, the government outlaws spontaneous expression."); *Rosen*, 641 F.2d at 1249. Consequently, in any particular forum, true spontaneous expression and the application of an advance notice requirement are mutually exclusive. Groups *may* be able to engage in expressive conduct after the notice period has expired, but the change in timing will alter the potential impact of their speech. For speech

---

[22]*Bayless*, which concerned a prior restraint directed at political speech, applied strict scrutiny. The concerns voiced in that opinion, nevertheless, are relevant here.

that is truly time sensitive, the precise spontaneous moment will be lost.

**[25]** *Bayless* provides an example of this concern. As we noted in that case:

> Restricting spontaneous political expression places a severe burden on political speech because, as the Supreme Court has observed, "timing is of the essence in politics . . . and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." To suggest that the [twenty-four hour] waiting period is minimal ignores the reality of breakneck political campaigning and the importance of getting the message out in a timely, or, in some cases, even instantaneous fashion.

*Bayless*, 320 F.3d at 1008 (citations omitted) (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring)); *see also City of Richmond*, 743 F.2d at 1356 ("A spontaneous parade expressing a viewpoint on a topical issue will almost inevitably attract more participants and more press attention, and generate more emotion, than the 'same' parade 20 days later."). In an era in which peaceful gatherings of large groups in public spaces to protest breaking events have resulted in rerun elections, as in the Ukraine, the importance of allowing such spontaneous public demonstrations cannot be underestimated. We conclude that to comport with the First Amendment, a permitting ordinance must provide some alternative for expression concerning fast-breaking events.

Food Not Bombs argues that limiting the spontaneous expression exemption to events coming into the public knowledge *within the past forty-eight hours* makes the ordinance unconstitutionally burdensome of speech. Were we to decide that the "spontaneous" event could be based on older news,

however, the exception would swallow the rule, and event organizers could simply avoid applying for a permit. The whole purpose of the spontaneous expression exemption is to accommodate speech when groups would otherwise be unable timely to seek a permit. Santa Monica's exemption serves precisely this purpose.[23]

[26] We conclude that where a city has erected a very brief advance notice requirement and where that requirement is otherwise limited and properly tailored in its application, a spontaneous expression exemption that accommodates time-sensitive expression does not, without more, offend the First Amendment.

Food Not Bombs' second basis of attack maintains that the exemption is inadequate because it opens only the City Hall lawn to spontaneous expression. The problem, Food Not Bombs asserts, is that groups that wish to tie their expression to a particular locale may not do so if they are availing themselves of the spontaneous expression exemption.

The ability to communicate a particular message in a particular location can significantly contribute to the effectiveness of that communication. *See Galvin*, 374 F.3d at 750 ("The Court has recognized that location of speech, like other aspects of presentation, can affect the meaning of communication and merit First Amendment protection for that rea-

---

[23]Appellants argue that "[i]f a group [ ] learned early Friday that the newly-elected governor was going to be appearing at an event in Santa Monica on Sunday afternoon, they would not come within the 'spontaneous' speech limits if they organize[d] a protest for any time after 9:00 a.m. on Sunday morning, even if they hold it on City lawn." Pursuant to the Instruction, permits for Category 3 events can be obtained from the Community Events Office during business hours and if that office is closed, from the Police Department between the hours of 8:00 a.m. and 5:00 p.m. Instruction at 11 (Section IV(1)(c)(1)), 44 (Section IX(11)(d)), & 50 (Section X). The timing of appellants' hypothetical event would thus allow for the group to obtain a permit.

son."); *City of Richmond*, 743 F.2d at 1350 (noting that "[certain] protests frequently occur in response to topical events, and their effectiveness may depend on both their immediacy and the forum where they take place"). In *Galvin*, the court identified a number of ways in which speech or expression might be tied to a particular location: (1) a location may be symbolic of the very object of the protest; (2) a location may be "one where many people habitually gather, providing an inexpensive way for individuals with a message to communicate to reach a general audience composed of a cross-section of their community"; (3) a location may be "one at which the particular audience the speaker seeks to reach is present"; or (4) a location itself may be significant to the content of the message. *Galvin*, 374 F.3d at 747-50.

The protection of location-specific speech, while broad, is not, however, without boundaries. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981); *see Galvin*, 374 F.3d at 751 ("As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, they may ordinarily — *absent a valid time, place, and manner restriction* — do so in a public forum." (emphasis added)).

The question, then, is not whether *some* limitation of the ability of groups to engage in spontaneous expression at *some* locations in Santa Monica is valid, but whether the particular exception the City has crafted goes far enough in permitting outlets for expression when the usual two-day application deadline cannot be met. Food Not Bombs cites *Galvin* for support of the proposition that it does not.

In *Galvin*, the United States Park Service Police declined to issue a permit to an advocacy group, Religious Witness with Homeless People, that applied for one in order to con-

duct a protest at the San Francisco Presidio National Park. *See* 374 F.3d at 742. At the protest, held without a permit, the police forced most of the protesters into alternate "First Amendment" areas 150 to 175 yards away from the specific building the protesters had chosen as their protest location. *Id.* at 743. We concluded that the particular restrictions the park police sought to place on *where* a protest might occur violated the First Amendment. As framed by *Galvin*, a regulation fails to leave open ample alternative means of communication when "[it] *prevents* the speakers from expressing their views, where that expression depends in whole or part on the chosen location." *Id.* at 756 (emphasis added).

For four reasons, the Events Ordinance does not preclude appellants from effectively expressing place-dependent views:

First, insofar as the speech is not time-sensitive, even large groups can engage in speech in any public forum location in the City if they comply with the advance notice/permitting requirements.

Second, with respect to time-sensitive speech, large groups have the opportunity to speak on the City Hall lawn, an area abutting the primary symbol of governmental power and authority in Santa Monica. That location is likely in most instances to satisfy the locational interests of those speakers who wish to discuss public affairs in the City.

Third, the safe harbor provision applicable to sidewalks and park paths will nearly always satisfy any remaining location-specific interest connected to spontaneous expression. Groups as large as 500 are permitted to protest without a permit so long as they abide by the less-than-fifty, two-abreast formation. By so doing, they can fully communicate their thoughts to an audience gathered in a particular location, such as a hotel or office building, in which a newsworthy event is taking place. Also, by so doing they can incorporate any location abutting a city sidewalk as part of their message. Even groups

as large as 1,999 can partake of this safe harbor as long as they gather initially in a location in which they do not need a permit, including — as we understand the Events Ordinance and Instruction, read together — the City Hall lawn.

Fourth, unorganized gatherings do not fall under the purview of the Events Ordinance. The Events Ordinance, as exemplified in the Instruction's permit application procedure, presumes the existence of an event organizer. *See* Instruction at 10-13 (Section IV(1)-(3)). Thus, if a news event or affair motivates an individual to express his or her views in public, the individual is under no obligation to obtain a permit.

**[27]** Given these various outlets for location-specific speech, we conclude that the Events Ordinance, taken as a whole and in light of the Instruction, provides ample alternatives for speech.

### 3.   *Service Fees*

**[28]** Citing to *City of Gary*, Food Not Bombs argues that SMMC § 4.68.140, which allows the City to charge departmental service fees, invites content-based or otherwise improper fee assessments. On the contrary, the Instruction provides content-neutral standards for post-event fee assessment, specifying that "[a] permittee shall not be required to provide for or pay for the cost of public safety personnel who are present to protect event attendees from hostile members of the public or counter-demonstrators or for general law enforcement in the vicinity of the event." Instruction at 37 (Section VIII(1)(a)); *see S. Or. Barter Fair*, 372 F.3d at 1141 ("[T]he standard does not allow the governing body to gauge the reaction the applicant's message will generate and set the fee according to the projected costs of policing hostile listeners, a feature the Supreme Court disapproved of in *Forsyth* as impermissibly content-based."); *City of Gary*, 334 F.3d at 682 ("It is apparent . . . that the requirement of the fee is not based on a concern with the burden on public services that parades

and other open-air assemblies impose — a concern that would be entirely legitimate and would permit the charging of a cost-based fee."); *see also E. Conn. Citizens Action Group*, 723 F.2d at 1056 (finding that an administrative permit fee was acceptable only to the extent that the official body could demonstrate its necessity in relation to costs that were *actually* incurred in connection with processing applications). The departmental service fee provision therefore withstands constitutional scrutiny.

## C.    Insurance and Indemnification Provisions

[29] As to the insurance and indemnification provisions, for reasons that appear in the separate opinions of Judge Kleinfeld and Judge Wardlaw, the majority of the panel is of the view that the provisions are valid. I, however, do not agree. This portion of this opinion therefore represents only my own views, not those of the panel majority.

Appellants argue that the Event Ordinance's insurance provision, SMMC § 4.68.120, does not sufficiently cabin official discretion. They also protest that the indemnification provision is invalid because it encompasses all suits against the City, without regard to the merit or outcome of the claims. Santa Monica, for its part, maintains that (1) the insurance provision presents no constitutional problem because permittees engaged in protected expression may elect to agree to indemnify the City instead; and (2) the indemnification agreement requires that the permittee indemnify the City "against [only those] claims attributable to the acts or omissions of the permittee." I respectfully disagree with my colleagues' conclusion that the Event Ordinance's insurance and indemnity provisions withstand constitutional scrutiny.

With a valid indemnification alternative, the insurance provision would present no constitutional problem. The particular indemnification alternative Santa Monica has adopted, how-

ever, is not a valid one because, as implemented, it impermissibly burdens speech in public places.

Employing a variety of standards, courts have commonly acknowledged that insurance requirements can indirectly restrict speech on the basis of its content. *See, e.g.*, *E. Conn. Citizens Action Group v. Powers*, 723 F.2d 1050, 1056 n.2 (2d Cir. 1983) (noting that an insurance requirement may allow for content-based considerations by the third-party insurance providers); *Collin v. Smith*, 578 F.2d 1197, 1209 (7th Cir. 1978) (noting that "the [insurance] requirement does not turn on the content of a proposed demonstration *except* in the sense that controversial groups will likely be unable to obtain insurance, as here." (emphasis added)); *Invisible Empire of the Knights of the Ku Klux Klan v. Mayor of Thurmont*, 700 F. Supp. 281, 285 (D. Md. 1988) (noting that the Ku Klux Klan could not obtain the required special event insurance because of the controversial nature of the group's message); *Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach*, 17 Cal. Rptr. 2d 861, 876-77 (Ct. App. 1993) (striking down insurance provision in part because "[the provision's] delegation of the amount of insurance charges to the market . . . appears inescapably to create a system of charges subject to impact and adjustment based on 'content,' including the element of hostility anticipation"); *Mardi Gras of San Luis Obispo v. City of San Luis Obispo*, 189 F. Supp. 2d 1018, 1030 (C.D. Cal. 2002) (following *Long Beach*). *But see Thomas v. Chicago Park Dist.*, 227 F.3d 921, 925 (7th Cir. 2000) (upholding an insurance requirement where "[t]he required amount and the cost of the insurance depend only on the size of the event and the nature of the facilities involved in it (a bandstand, stage, tents, and so forth)"), *aff'd on other grounds*, 534 U.S. 316 (2002).

The Instruction, pursuant to SMMC § 4.68.120(a), excludes Category 2 and 3 events — the categories that include expressive activity — from the insurance requirement imposed by SMMC § 4.68.120, if the applicants agree to indemnify the

City. Instruction at 35 (Section VII(14)(g)).[24] The Instruction spells out the indemnification agreement as one in which the permittees

> agree[ ] to defend, protect, indemnify and hold the City, its officers, employees, agents, and volunteers free and harmless from and against any and all claims, damages, expenses, loss of liability of any kind or nature whatsoever resulting from the alleged willful or negligent acts or omissions of permittee, its officers, agents, or employees in connection with the permitted event or activity; and the permit shall expressly provide that the permittee shall, at permittee's own cost, risk and expense, defend *any and all claims and all legal actions that my [sic] be commenced or filed against the City its officers, agents, employees, or volunteers*, and that the permittee shall pay any settlement entered into and shall satisfy any judgment that may be rendered . . . as a result of the alleged willful or negligent acts or omissions of permittee . . . *in connection with* the uses, events, or activities under the permit.

*Id*. at 35-36 (Section VII(15)) (emphases added). The actual indemnification agreement, submitted as part of Santa Monica's request for judicial notice, contains significantly broader language, requiring that:

> [a permittee] defend, indemnify, and hold harmless the City of Santa Monica . . . from and against any and all loss, damages, liability, claims, suits, costs and expenses, whatsoever, including reasonable

---

[24]In cases where "there is a specific demonstrable history of personal injury or property damage claims being awarded against the applicant attributable to the applicant's conduct of [similar] previous events," Category 2 and 3 event applicants are required to obtain insurance. Instruction at 35 (Section VII(14)(g)).

attorney's fees, *regardless of the merit or outcome of any such claim or suit, resulting from the alleged acts or omissions of permittee . . . in connection with the permitted event or activity.*

Request for Judicial Notice at 49 (emphasis added).[25]

"Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). Because of the broad language in the Instruction and indemnification agreement, the agreement runs afoul of this basic principle.

In *Forsyth County*, the Court struck down a provision allowing a city administrator to assess a fee against permit applicants based on the cost of protecting persons participating in and observing covered events. *See id.* at 134. The provision was held infirm because the assessed fee would necessarily depend on the administrator's estimation of the hostility "likely to be created by the speech *based on its content*." *Id.* (emphasis added) ("Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit.").[26]

---

[25]Although Food Not Bombs argues that the City faces no liability, there is no reason to decide whether that is so. The indemnification agreement seeks to hold permittees financially responsible for suits not necessarily predicated on any *actual* liability the City might face.

[26]*Forsyth County* demonstrates the error in Judge Wardlaw's view that Santa Monica's indemnification provision is not impermissibly content based. As it stands, the indemnification provision is *necessarily* premised on the behavior and reactions of third parties. *See Forsyth County*, 505 U.S. at 134. While the indemnification provision and the actual indemnification agreement do not make permittees potentially liable for actions of hecklers who attend the event, they do not protect permittees from bearing liability for lawsuits brought by a different sort of heckler who, after the fact, seeks to make permittees liable for damages for actions which allegedly occurred during the event, whether or not the actions actually occurred. Also, and most significantly, the indemnification provision and

Here, the indemnification provision is limited to the costs of suit and liability premised on a permittee's own "alleged willful or negligent acts or omissions." This limitation might appear to avoid the problems that made the fees challenged in *Forsyth County* unconstitutional. On closer examination, however, that is not the case.

Under the indemnification provision, permittees are responsible for costs created after the event by litigants seeking to establish that the permittees owe them damages for something that allegedly happened during the event. If this indemnification provision were limited to *meritorious* suits concerning permittees' *actual* activities, I would have no problem approving it. But it is not. Instead, the provision requires permittees to promise to pay for Santa Monica's legal defense in cases brought by third parties, based on "alleged," rather than *actual*, "acts or omissions." So the indemnification requirement is *not* limited to permittees' actual behavior.

Also, the indemnification provision does not exclude lawsuits against the City triggered by or focused on injuries caused by the content of purely expressive activity allowed for by a permit. For example, a retail clothing business located on one of Santa Monica's streets could file a lawsuit against the City alleging economic harm from loss of business caused by a permitted event protesting the use of sweatshop

agreement are drafted without regard to whether a permittee's alleged liability is based on constitutionally protected activity. Permittees, therefore, might be required to pay the City's costs for litigating suits brought to obtain damages caused by the content of their peaceful, constitutionally protected speech. It would be simple to change the requirement so that permittees must reimburse the City only for the cost of *meritorious* lawsuits, which by definition would not permit damages for constitutionally protected speech and would also remove the threat that permittees will be subject to an after-the-fact heckler's veto in the form of a costly, nonmeritorious lawsuit. Without such a fix, the provision is not, in my view, constitutionally sound.

labor. The indemnification provision would require that an event organizer, although constitutionally entitled to conduct his event and to seek to persuade observers to boycott the retailer, reimburse the City for costs of defending the lawsuit.

The result is that permittees' speech is contingent on an agreement to cover costs in an unknown amount, generated by third parties over whom the speakers have no control and who may be hostile to them, and who may be seeking damages for injuries caused solely by the content of constitutionally protected activity. In other words, as in *Forsyth County*, those costs may be premised *not* on any tort or other wrongdoing by the permittees, but on the reactions of third parties to the permittees' communication. Because the costs generated need not reflect the permittees' actual behavior and could be the result of the content of the permittees' speech, the indemnification provision, like the fee provision in *Forsyth County*, exposes event organizers to costs based *not* on their own acts or omissions but on costs "associated with the public's reaction to the speech." 505 U.S. at 134.

For these reasons, the indemnification provision is not content neutral. Also for these reasons, the indemnification provision, despite its limitation to *allegations* concerning permittees' own behavior, is not narrowly tailored to the governmental interest in protecting the City from bearing costs arising from injuries or other liabilities due to the permittees' wrongful conduct of the event or conditions at the site.

To require that event organizers engaged in constitutionally protected speech contractually bind themselves to indemnify the City for the costs associated with wholly meritless suits brought by third parties is thus constitutionally unsound. Because I would therefore hold the insurance and indemnification provisions invalid, I respectfully dissent on this single point.

## III. CONCLUSION

In sum, the panel (1) vacates as moot the district court's summary judgment with respect to appellants' challenges to the street banner ordinance, SMMC § 4.08.490-.500, and to one of the food distribution ordinances, SMMC § 5.06.020, and remands to the district court with instructions to dismiss the relevant claims; (2) affirms the district court's order with respect to the other challenged food distribution ordinance, SMMC § 5.06.010; (3) reverses and vacates the district court's order insofar as it upholds the constitutionality of SMMC § 4.68.040(a), with respect to city streets and public ways, and holds that the Instruction's per se publicity provision, Instruction at 5 (Section III(1)(b)), renders unconstitutional SMMC § 4.68.040(b) and cannot be enforced;[27] and (4) otherwise affirms the district court's judgment upholding the Events Ordinance and Instruction.[28]

### VACATED and REMANDED in part; AFFIRMED in part.

---

[27]We also hold that the indemnification provision is not preempted, as Santa Monica is not attempting to expand its statutory immunities. *See Societa per Azioni de Navigazione Italia v. City of L.A.*, 645 P.2d 102, 112-13 (Cal. 1982) (holding that a city may not by ordinance abridge its duty to provide implied comparative indemnification under the California Tort Claims Act).

[28]The district court did not address the per se publicity provision, as that provision was added to the Instruction after judgment was entered.

Food Not Bombs also challenged the timelines established by the Events Ordinance for the issuance of permits and determination of appeals. In the aftermath of *Thomas*, we have held that content-neutral permit schemes need not contain the procedural safeguards required for content-based schemes. In *South Oregon Barter Fair*, we held that "[a content-neutral scheme] need not include either a deadline for consideration by the governing body or a provision for prompt judicial review[,]" so that "[t]he lack of a permit application deadline [for consideration by the governing body] is not sufficient to invalidate the Act in a facial challenge." *S. Or. Barter Fair*, 372 F.3d at 1138-39. Therefore, the challenge to the timelines fails.

KLEINFELD, Circuit Judge:

I concur in parts of Judge Berzon's opinion, and dissent from parts. As to one issue, the ordinance's hold harmless and insurance provisions, this separate statement constitutes the majority opinion of the court.

I concur in the results the majority reaches insofar as the majority holds that the ordinances, as interpreted and enforced through the administrative instructions, are constitutionally permissible. As to those parts, I do not entirely concur in the opinion itself, largely because dicta goes beyond what we need to decide.

Under the Constitution, the "judicial power" extends only to "cases."[1] The case before us here is one in which we have largely upheld the ordinances and instructions. We do not have the power to codify the law of public assemblies under the First Amendment, just to decide this case. I therefore do not join in the opinion to the extent that it speaks to cases contrary to the facts in this case and suggests what the law would be were we to decide those cases. While I appreciate the utility of clarifying our expression by contrasting other hypothetical cases in which we might reach different conclusions, we do not have authority to make law for such other hypothetical cases or to issue advisory opinions.[2]

For example, in the analysis portion of the opinion, section II, subsections A, (B)(2)(a), and (B)(2)(b)(1)(a)(i) strike me as correct until I get to page 6678, lines 22 through 24, which say what our view would be if the implementing instruction were not there. That is a case not before us, and one which we lack authority to decide. This error is carried forward at page 6681, lines 1, *et seq.*, where we purport to hold unconstitutional an ordinance unaccompanied by the instruction, even

---

[1]U.S. Const. art. III, §2, cl. 1.

[2]*United Public Workers of America v. Mitchell*, 330 U.S. 75, 89 (1947).

though such an unaccompanied ordinance is not before us for adjudication. Likewise, we plainly announce in footnote 17 that we are not deciding a question not before us, then issue a "caution" as though we were. I would leave the issuance of "cautions" about matters not at issue in the present case to municipal attorneys. I do not mean to imply that these are the only dicta or that these are the only dicta that I would not reach. These statements merely illustrate the types of troubling language that prevent me from joining the majority opinion.

I do not agree with the holding that the ordinance is unconstitutional, as page 6684, lines 3-5, purports to hold, for "all other city streets and public ways." The word "may" that troubles the majority is in a section that requires permits, but does not condition their issuance.[3] Issuance of permits is bounded by strictly tailored requirements that do not impinge upon content or viewpoint and legitimately protect the use of public ways by others while demonstrations and marches proceed. The organizers of the demonstration are in a far better position than the municipality to know whether their planned activity may impede traffic or violate the traffic regulations. The permit process necessarily requires uncertain prediction of the future because permits are obtained before the events. Requiring a permit for these types of activities protects the rights of other citizens without unduly burdening those seeking to demonstrate.

---

[3]The full text of this section states "(a) A parade, procession, march or assembly consisting of persons, animals, vehicles, or any other combination thereof, which is to assemble or travel in unison on any public street, highway, alley, sidewalk or other public way and which either (1) may impede, obstruct, impair or interfere with free use of such public street, highway, alley, sidewalk, or other public way owned, controlled, or maintained by the City or (2) does not comply with normal or usual traffic regulations or controls." SMMC §4.68.040(a).

## I.  Advertising Provision

I also respectfully dissent from the majority's conclusion, found at section II(B)(2)(b)(1)(a)(ii), that the advertising instruction vitiates the narrow tailoring of the ordinance for large groups. The ordinance and instruction do not in any way regulate or limit advertising. The ordinance requires a permit for assemblies that may impede free use of the public ways by others or that will not comply with traffic regulations.[4] It also requires a permit for activities involving groups of 150 or more on city property.[5] The majority properly concludes that this permit requirement, as it stands, is constitutionally permissible because any group this large on city property is bound to affect use of the property by others equally entitled to use it. The problem the majority identified is with the administrative instruction, which deems events publicized over radio, television or "widely-distributed print media" to be events with 150 or more people.[6] I disagree with the majority's conclusion that this in some way restricts advertising or vitiates the narrow tailoring of the ordinance.

As anyone who has organized a demonstration, concert, lecture, parade, or picnic knows, one cannot predict in advance how many people will show up. One publicizes the event and hopes for the best. Turnout is likely to be affected not only by support for the cause but also by the weather. I have been to boring lectures with sexy titles or famous speak-

---

[4]*Id.*

[5]Requiring a permit for "[a]ny activity of a group of 150 or more persons on City owned, controlled, or maintained property." SMMC §4.68.040(b).

[6]The instruction requires a community events permit for "[a]ny activity or event of 150 or more persons on City owned, controlled or maintained property not subject to the requirements in subsection (a) of this section. For purposes of this subsection, any activity or even which the applicant intends to advertise via radio, television and/or widely-distributed print media shall be deemed to be an activity or event of 150 or more persons." Administrative Instruction II-4-4 (III)(1)(b).

ers that had people standing outside the doors just to hear a little, yet I also went to an appearance by Milton Friedman in the 1960's that drew only four faculty members and one student. Attendance is inherently unpredictable, but municipalities and event organizers have to do some planning to avoid the risk of a traffic or public health catastrophe if thousands of people come to an enormous event that provides no toilets or causes a traffic jam that prevents people from getting to work or, perhaps, to voting booths, and blocks ambulances, police cars, and fire trucks.

The size of a public demonstration cannot be known in advance, yet has to be predicted somehow in order to properly provide for public safety and fairly shared use of public property. After all, people are entitled to use the public spaces not only to express political opinions, but also, with every bit as much entitlement, to go to work, walk their dogs, toss frisbees, or get a six pack of beer. This administrative instruction is a legitimate, common-sense means of channeling the discretion of administrative personnel, since it is impossible to predict how big an event will be. The majority cites no case that would make the advertising instruction unconstitutional and I see no justification for abridging common sense. Event organizers who advertise "via radio, television and/or widely-distributed print media," as the administrative instruction provides, are certainly not trying to hold attendance down, as though it were a wedding reception that cost the bride's family $200 a plate. It can reasonably be inferred from mass advertising that they are hoping for a large turnout and trying to get all the people they can.

If the organizers advertise on radio and television without getting a permit, but in the end get a disappointing turnout of less than 150 people, they cannot be prosecuted, because, although the instructions say they should have sought a permit, they have not violated the ordinance itself; a violation requires that the event on city property actually have "150 or

more persons."[7] If they advertise widely and hope for the best, then the neutral permit procedure gives them a safe harbor in case the advertising attracts a big turnout.

Even if the organizers without a permit ring the bell with an advertising campaign that draws hundreds of demonstrators, they can still avoid prosecution if they give a little attention to the ordinance and the rights of other members of the public. All they have to do under the administrative instructions is break the demonstration into groups of under 50, walk two abreast, follow traffic laws, and avoid impeding others.[8] That way the commuters, shoppers, and dog walkers can peacefully pass through. Even groups of up to 1,999 people can still proceed but with additional restrictions on how the group is divided up.[9]

---

[7]*Mirro-Dynamics Corp. v. United States*, 374 F.2d 14, 16 (9th Cir. 1967) (Citing *Hirshon v. United States*, 116 F. Supp. 135, 136 (Ct. Cl. 1953), for the proposition that administrative instructions cannot go beyond the underlying law).

[8]Administrative Instruction II-4-4(V)(4)(a) provides that "[a] march, procession, walk, run or assembly will not interfere with the free use by others of a public sidewalk or City park path and is not required to obtain a Community Event Permit if the total group consists of 500 or fewer participants and if all participants:

- Assemble, march, walk, or run in groups of less than 50, 2 abreast (to create spacing between groups), and give way to others they encounter on the public way.

- do not obstruct traffic flow.

- obey all traffic regulations.

- obey all park regulations."

[9]Administrative Instruction II-4-4(V)(4)(b) provides that "[a] march, procession, walk, or run that exceeds 500 participants, but is less than 2,000 participants, will not interfere with the free use by others of a public sidewalk or a City park path and is not required to obtain a Community Event Permit if the requirements of subsection (a) of this Section are met, if start times are staggered to create spacing between groups, if private property is used as the start/finish location, and if the event organizer provides a plan for participants' parking. All assemblies on a public sidewalk or park path that exceed 500 participants will require a Community Event Permit."

This is about as narrowly tailored as an ordinance can be, considering the impossibility of predicting in advance how successful a demonstration will be. And some such ordinance is necessary to enable people besides the demonstrators to make reasonable use of the municipal property on the day of the demonstration.

## II.   Hold Harmless Provision

This portion of my separate opinion is joined by Judge Wardlaw, and is, therefore, the majority opinion of the court.

The ordinance requires permittees to defend the city, to hold the city harmless from claims arising out of the permittee's actions,[10] and, with exceptions, to provide proof of insurance covering the city for the risks.[11] To the extent that the

---

[10]As articulated by the Administrative Instruction: "Each permit for Category 1, 2, and 3 events shall expressly provide that the permittee agrees to defend, protect, indemnify and hold the City, its officers, employees, agents, and volunteers free and harmless from and against any and all claims, damages, expenses, loss of liability of any kind or nature whatsoever resulting from the alleged willful or negligent acts or omissions of permittee, its officers, agents, or employees in connection with the permitted event or activity; and the permit shall expressly provide that the permittee shall, at permittee's own cost, risk and expense, defend any and all claims and all legal actions that may be commenced or filed against the City, its officers, agents, employees, or volunteers, and that the permittee shall pay any settlement entered into and shall satisfy any judgment that may be rendered against the City, its officers, agents, employees, or volunteers as a result of the alleged willful or negligent acts or omissions of permittee or permittee's officers, agents, or employees in connection with the uses, events, or activities under the permit." Administrative Instruction II-4-4(VII)(15).

[11]"Except as otherwise prohibited by law or an exemption is obtained as provided by this Chapter and the implementing regulations, the permittee shall procure and maintain in full force and effect during the term of the permit a policy of insurance from a reliable insurance company authorized to do business in the state, which policy includes the City, its boards, officers, agents, employees, and volunteers as named insureds or addi-

insurance and hold harmless provisions of the ordinance apply to expressive activity, they are content and viewpoint neutral.

Our dissenting colleague's concern is that the provisions require indemnification for conduct that is not the permittee's fault. There are two apparent ways (and doubtless more not so apparent) that such a claim might trigger the requirement. First, a suit could be non-meritorious or frivolous. Second, someone could be hurt by the conduct of an opponent of the demonstration through no fault of the permittee.

These possibilities do not undermine the constitutionality of the requirement. Liability insurance policies typically obligate the insurer to defend the insured against covered third party claims even if they are "groundless, false, or fraudulent," and are typically construed to impose that duty even when they do not use the "groundless, false, or fraudulent" phrase.[12] The reason is that anyone seeking to be held harmless needs such defense, and the groundlessness, falseness, or fraudulence of the claims cannot be established until the defense has already been provided. Indemnification, by means of a hold harmless agreement and liability insurance, by users of others's property, is a common condition for the use of both private and public property. Like liability insurance, it must protect against both well-founded and unfounded claims to be useful.

---

tional named insureds and which provides the coverage that the Risk Manager determines to be necessary and adequate under the circumstances. Proof of insurance shall be submitted to the City prior to issuance of the permit and maintenance of this insurance shall be a condition of the permit." SMMC §4.68.120.

[12]Keeton, Robert E. & Alan I. Widiss, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines and Commercial Practices* 1021-22 (Practitioner's ed. 1988); *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 271-72 (1966).

The administrative instructions set out three categories of events.[13] The insurance and hold harmless provisions apply most generally to non-expressive activities not implicating the First Amendment such as games, surfing contests, and races.[14]

---

[13]"There are three principal categories of community events. Different regulations apply depending on the category. The categories are:

  a.  Category 1 Events

- recreation (e.g., games, arts & crafts activities, reunions, birthday parties, participatory dances)

- competition/contests (e.g., surfing contests, sand castle building)

- spectator sports (e.g., beach volleyball, hockey, basketball)

- athletic events (e.g., races, runs)

- circuses, fairs and carnivals (e.g., booths, games, rides and similar amusements)

- food-related events (e.g., barbeques, cook-offs, picnics, food distribution, food festivals)

- sales/trade shows/business promotions (e.g., crafts shows, antique shows, merchandise sales or exhibits, product launches)

- beach/park clean-ups

- training activities (e.g., corporate sessions, team-building activities

  b.  Category 2 Events
Events not included within Category 1 above but which require a permit from Building and Safety and/or the Fire Department as detailed in Section VII (4) and (5) of this Administrative Instruction.

  c.  Category 3 Events
Events not included within Categories 1 and 2."

Administrative Instruction II-4-4 (III)(2).

[14]"Category 1 events will be required to provide general liability insurance. The City's Risk Manager will review the Community Event Permit applications and may require additional insurance, such as auto, liquor, or garagekeeper's liability, if it is deemed necessary." Administrative Instruction II-4-4 (VII)(14)(a).

Political demonstrations generally do not have to provide insurance "unless there is a specific demonstrable history of personal injury or property damage claims being awarded against the applicant attributable to the applicant's conduct of previous events in the City that are similar in nature to the proposed event."[15] Political demonstration organizers can even avoid both the hold harmless provision and the insurance provision if they cooperate with the City Manager to design the event "to respond to specific risks, hazards and dangers to the public health and safety identified by the City Manager or his/her designee as being reasonably foreseeable consequences of the permitted event."[16] Thus most demonstration organizers will not have to provide insurance and even those with a destructive history can avoid the insurance requirement if they choose to work with the City Manager to avoid repetition of past injuries or property damage.

There is no authority for holding such neutral, common-sense protections against municipal liability unconstitutional. Our dissenting colleague relies on *Forsyth County, Georgia v. Nationalist Movement*,[17] but it is not on point. In *Forsyth*, the county charged $5 to the Girl Scouts, $25 to a bicycle race, and $100 to the racist demonstrators.[18] By contrast, the ordinance in this case merely protects the county from liability in the conventional manner of any property owner, with no discretion for administrators to discriminate by expressive content or viewpoint.

Thus, I would affirm the district court judgment in full.

---

[15]Administrative Instruction II-4-4 (VII)(14)(g).

[16]*Id.*

[17]*Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123 (1992).

[18]*Id*. at 132.

WARDLAW, Circuit Judge, concurring:

I concur in Judge Berzon's principal opinion, except as to Part II.C. In my view, the indemnification provision is content neutral. "In determining whether a regulation is content based or content neutral, we look to the purpose behind the regulation." *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001); *see also Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1043-44 (9th Cir. 2002). The purpose of Santa Monica's indemnification provision is to protect the public fisc, not to burden particular speech. A regulation requiring permittees to defend against suits that result from *their own* acts or omissions, regardless of the ultimate success of the suit, does not discriminate based on the content of the message; nor is it unreasonable. *See* Cal. Civ. Code § 2778 (defining default rule in interpretation of indemnification agreements that the indemnitor pays the cost of defending claims).

Judge Berzon's reading of *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) is overly broad. In that case, the ordinance allowed the county administrator to adjust the size of the permitting fee, based on his perception of the amount of police protection permittees might require. *Id.* at 133-34. That standardless, unfettered discretion raised the specter that "[t]he fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content." *Id.* at 134; *see also Am. Civil Liberties Union v. City of Las Vegas*, 333 F.3d 1092, 1107-08 (9th Cir. 2003). By contrast, the Santa Monica ordinance does not expose any speaker to risks or costs that are not equally faced by every other speaker.[1] The permittee's

---

[1] If the provision made permittees responsible for acts or omissions caused by parties other than the permittee or his agents, or if it placed unfettered discretion in the hands of government administrators, I might reach a different conclusion. *See Forsyth County*, 505 U.S. at 134-35; *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1255 (11th Cir. 2004); *Van Arnam v. GSA*, 332 F. Supp. 2d 376, 401 (D. Mass. 2004).

burden of defending and indemnifying the city, against lawsuits meritorious or not, is the same whether the permittee advocates against the war in Iraq or against the *Da Vinci Code*. Such is the essence of content neutrality. The Santa Monica indemnification provision might reach further than necessary to protect the city's interests, but that is a question of narrow tailoring. It does not make the provision itself content-based.

Food Not Bombs failed to raise what might have been the better argument: that Santa Monica's content neutral indemnification provision is not narrowly tailored to legitimate government interests. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989); *see also Nationalist Movement v. City of York*, ___ F. Supp. 2d ___, 2006 WL 759645, at *10 (M.D. Pa. Mar. 24, 2006) (upholding an indemnification requirement against narrow tailoring challenge); *Van Arnam v. GSA*, 332 F. Supp. 2d 376, 403-04 (D. Mass. 2004) (striking down an indemnification requirement as not narrowly tailored). Because the issue was not argued before the district court or on appeal, however, it has been waived.

Therefore, I join Judge Kleinfeld in holding that Santa Monica's indemnification provision does not violate the First Amendment.